**UNITED STATES of America,**
**Appellant,**

v.

**Murphy J. FOSTER and Olive R. Foster,**
**Appellees.**

**No. 20370.**

United States Court of Appeals
Fifth Circuit.

Nov. 14, 1963.

Louis F. Oberdorfer, Asst. Atty. Gen., Dept. of Justice, Lee A. Jackson, Melva M. Graney, Michael Mulroney, Attys., Dept. of Justice, Washington, D. C., Louis C. LaCour, U. S. Atty., New Orleans, La., for appellant.

Walter J. Suthon, III, New Orleans, La., Thomas A. Harrell, Shreveport, La., for appellees, Monroe & Lemann, New Orleans, Blanchard, Goldstein, Walker & O'Quin, Shreveport, La., of counsel.

Before RIVES and JONES, Circuit Judges, and DAWKINS, District Judge.

BENJAMIN C. DAWKINS, Jr., District Judge.

This appeal tests the correctness of a judgment by the trial court wherein appellees prevailed in a tax refund suit. The question for decision is whether, in a case involving facts as here presented, proceeds from the sale of an oil payment [*] are to be treated as ordinary income or capital gain. Both the oil payment and a royalty interest were reserved by the taxpayer (See fn. 1) when he executed a mineral lease, but only the oil payment subsequently was sold.

Murphy J. and Olive R. Foster brought this action for refund of income taxes and interest for the year 1955 amounting to $1,517.38.[1] Taxpayer owned an undivided 1/10th interest in Dixie Plantation, containing about 800 acres, in St. Mary Parish, Louisiana. July 1, 1955, he and his co-owners executed an oil, gas and mineral lease upon all but 11.11 acres of the land to Chester Hunter, for a six-months primary term and so long thereafter as oil or gas was produced.

Taxpayer and his co-lessors received a bonus of $5,000, but they retained what was termed a 10/24ths "royalty" interest until $220,000 was paid, and thereafter a 5/24ths royalty.[2] On the same day this lease was executed, the lessors sold to

---

[*] An oil payment, or production payment, has been defined for federal tax purposes as "a right to oil and gas in place that entitles its owner to a specified fraction of production for a limited time, or until a specified sum of money, or a specified, number of units of oil or gas has been received." Prentice-Hall, Oil and Gas Taxes ¶ 10,001.

[1] Mrs. Foster was made a plaintiff merely because a joint return had been filed for 1955. In this opinion the term "taxpayer" is used with reference to Mr. Foster.

[2] The lease contract provided in Section 4:
"The royalties to be paid by Lessee are:
"(1) At all times prior to the date when there shall have been delivered and paid to Lessor royalties on oil and gas produced from the Leased Premises aggregating $220,000 plus severance tax applicable thereto, the royalties on oil and

other parties what they described as a "royalty," but which was limited to a payment of $110,000 out of 5/24ths of production.[3] The transfer was made subject to the Hunter lease. The assignors received $100,882.35 for the oil payment, of which taxpayer's share was $10,088.23.

In his 1955 income tax return taxpayer treated this transaction as the sale of a capital asset held for more than six months. After an audit, the Internal Revenue Service disallowed capital gain treatment and determined that the proceeds were ordinary income subject to depletion allowance.

The District Court, however, in granting plaintiffs' motion for summary judgment (the parties having stipulated the facts), held that there had been a sale of a capital asset.[4] It reasoned that the true nature of the interest conveyed must be examined in order to determine whether it was property subject to capital gain treatment under the provisions of the Internal Revenue Code.[5] In a footnote, the Court explained Louisiana's concept as to mineral servitudes. It noted that, although ownership of minerals in place is not recognized in Louisiana, for income tax purposes Louisiana mineral servitudes, leases, royalties, oil payments, and other mineral interests are property rights which may be treated as capital assets if they meet the test of Section 1221 of the 1954 Internal Revenue Code, as interpreted by the Courts.[6]

Applying the accepted rule that the substance of the transaction must be determined from its total effect, the Court found that two separate and distinct property interests had been retained by taxpayer: 1) his share of a 5/24th royalty interest and 2) his share of a $110,000 oil payment from another 5/24th of production. These interests ran concurrently, so the Court held, as did the oil payment interests in Witherspoon v. United States,[7] in which it was held that where two retained oil payments run concurrently, proceeds from the sale of one are subject to capital gain treatment.

The District Court thus reasoned that two separate interests were retained, that they were concurrent interests, each independent of the other, and therefore the oil payment assignment here made was

gas produced shall be: (a) On oil and other hydrocarbons which are produced at the well in liquid form by ordinary production methods, ten-twenty-fourths (10/24) of that produced and saved from said land, * * *.

* * *

"(2) After the date when there shall have been paid and delivered to Lessor royalties on oil and gas produced from the Leased Premises aggregating $220,000 plus severance tax applicable thereto, the royalties on oil and gas produced shall be:

"(a) On oil, and other hydrocarbons which are produced at the well in liquid form by ordinary production methods, five-twenty-fourths (5/24) of that produced and saved from said land, * * *."

3. This interest was described in the act of assignment as:

"The royalty interests and rights herein sold, transferred and conveyed are FIVE TWENTY-FOURTHS (5/24) of the whole of any oil, gas or other minerals, except sulphur, on and under and that may be produced from said lands under oil, gas and mineral lease executed by

grantors this date to Chester Hunter, and only under said lease; delivery of said royalties to be made to the purchasers herein in the same manner as is provided for the delivery of royalties by said mineral lease. PROVIDED, HOWEVER, that this conveyance and grant shall cease and terminate, and shall be of no further force or effect (1) if and when there shall have been paid and delivered to the grantees herein royalties aggregating in value ONE HUNDRED TEN THOUSAND AND NO/100 ($110,000.00) DOLLARS plus severance tax applicable thereto, or (2) if and when said lease to Chester Hunter shall terminate, whichever event shall earlier occur. * * * *"

4. Foster v. United States of America, 207 F.Supp. 104 (E.D.La., 1962).

5. Internal Revenue Code of 1954, Sections 1221 and 1222.

6. The District Court found that an oil payment is a property right in Louisiana where even an uncertain hope may be the subject of a sale. (Article 2451, LSA–Civil Code.)

7. No. 2115 Civil, U.S.D.C., N.D.Tex. (1956), 52 A.F.T.R. 1836.

not that of a carved out interest. Therefore, it held, the proceeds of this sale were subject to capital gain treatment.[8]

A further basis for the Court's decision was that the ultimate pay-out of an oil payment on nonproducing land, such as here, could not be calculated with the degree of accuracy required by the Supreme Court to classify it as an assignment of future income.[9] Other considerations mentioned by the Court in this connection were that the lessee was not obligated to drill a well on the land, and the lease would terminate if no well was drilled within four months from the date of the lease agreement. It also would terminate if a second well was not begun within three months after completion or abandonment of the first well. An affidavit given by the lessee indicated that, although he considered "there was a reasonably good possibility the premises would be productive of oil or gas," the formation was known to be faulted and therefore production could not be predicted with certainty. Later developments substantiated in some measure the correctness of his estimate in that the second well drilled was a dry hole. But we must note significantly at this point, and as later discussed in more detail, there were producing wells on adjoining property and the 11.11 acres of Dixie Plantation excluded from the lease already were

included in a producing unit established by the Louisiana Commissioner of Conservation.

For the reasons we now present, it is our conclusion, despite the persuasiveness of the District Court's opinion, that it erred in holding the proceeds from taxpayer's assignment of the oil payment to be entitled to capital gain treatment.

In a case decided after Witherspoon—Estate of O. W. Killam, 33 T.C. 345 (1959)—the Tax Court held that proceeds from the sale of a "carved out" oil payment[10] amount to a transfer of anticipated future income, and therefore are taxable as ordinary income. However, in Killam the Court apparently deemed it necessary expressly to distinguish Witherspoon by pointing out that there the interests ran concurrently, whereas in Killam they ran successively.[11]

The significance as to whether an oil payment runs concurrently with another interest lies in the test sometimes used in determining whether an oil payment is a capital asset or not. This concept is to the effect that, if the oil payment is *carved out* of another, larger and longer mineral interest, and the price received for the sale is not pledged to development, then it is treated as ordinary income.[12]

8. The government argues in this Court that if the oil payment was created at the time of the lease, then it was not held for the required six months period necessary for capital gain treatment. This argument was not presented to the District Court. As discussed later in this opinion, the taxpayer's retained oil payment was merely a part of the over-all reserved interest, and this interest, as a portion of a still larger interest, had been held for more than six months.

9. The requirement of reasonable accuracy in estimating payout obviously was inferred from language of the Supreme Court in Commissioner of Internal Revenue v. P. G. Lake, Inc., 356 U.S. 260, 78 S.Ct. 691, 2 L.Ed.2d 743 (1958), rehearing denied, 356 U.S. 964, 78 S.Ct. 991, 2 L.Ed.2d 1071 (1958). We agree that such an inference is proper (See fn. 20), but for the reasons indicated *infra* do

not agree with its application by the District Court in this case.

10. The carved out oil payment extended over a period less than the life of the depletable property interest from which it was carved.

11. Oil payments run successively if no payment must be made on the second until the first is paid out. Conversely, they run concurrently if payments are made to each simultaneously.

12. Commissioner of Internal Revenue Ruling, I.T. 4003, 1950–1 Cum.Bull. 10; Breeding and Burton, Income Taxation of Oil & Gas Production, Paragraph 6.03; Fiske, Federal Taxation of Oil & Gas Transactions, § 9.06. This rule does not apply if the carved out interest extends over the entire life of the interest from which it was carved.

The landmark case of Commissioner v. P. G. Lake, Inc., supra, fn. 9, laid down certain broad principles which govern in determining whether proceeds from the sale of an oil payment are subject to capital gain treatment. There the Supreme Court found that the Internal Revenue Code's capital gain provisions are designed to relieve the taxpayer from an excessive tax resulting from conversion of property which has appreciated in value over a period of time.[13] This treatment is an exception to the general rule of taxing all net income as ordinary income, and, as an exception, it should be narrowly construed.[14] Consideration received upon transfer of mineral interests will be carefully scrutinized to determine whether it was accepted for an increase in value of an income-producing property or merely in place of the right to receive future income.[15]

No rule was established by Lake requiring *all* carved out interests to be taxed as ordinary income simply upon a finding that they were carved out and that the price received was not pledged for development. The substance and effect of the whole transaction must be examined; form alone will not control. Nevertheless, the Commissioner, some courts, and legal writers continue to espouse definitions and rules as to ordinary income or capital gain couched in terms of whether an interest is carved out or not.[16] An oil payment is said to be carved out if the owner of any royalty, lease, or other mineral interest, including a larger oil payment, assigns an oil payment but retains an interest in the property from which the oil payment is assigned.[17] We believe a close analysis of Killam and Floyd, supra, fn. 17, will clarify application of this concept in determining whether there has been a sale of a capital asset or assignment of future income.

In Killam, the taxpayer sold his interest in a mineral lease and reserved a $150,000 oil payment, plus 4% interest on the unpaid balance, from 75% of $\frac{7}{8}$ths of the oil produced; and thereafter a $200,000 oil payment, plus 4% interest on the unpaid balance from 80% of $\frac{7}{8}$ths of the oil produced. Subsequently, he sold the $150,000 oil payment. It was held that this was a carving out of an interest extending over less than the life of the entire depletable lease property from which the interest was carved. The two reserved oil payments were treated as one property interest from which the

---

13. Commissioner of Internal Revenue v. Gillette Motor Transport, Inc., 364 U.S. 130, 80 S.Ct. 1497, 4 L.Ed.2d 1617 (1960); Commissioner v. P. G. Lake, Inc., supra; Corn Products Refining Co. v. Commissioner, 350 U.S. 46, 76 S.Ct. 20, 100 L.Ed. 29 (1955); Burnet v. Harmel, 287 U.S. 103, 53 S.Ct. 74, 77 L.Ed. 199 (1932).

14. Commissioner v. P. G. Lake, Inc., supra; Corn Products Refining Co. v. Commissioner, supra.

15. Commissioner v. P. G. Lake, Inc., supra; Dyer v. Commissioner, 294 F.2d 123 (10 Cir., 1961).

16. See generally:
   "ABC Transactions and Related Income Tax Plans," 40 Texas Law Review 18 (1961–62).
   "Are the Final Natural Resources Regulations Really Final: Definition of Property," New York University Twentieth Annual Institute on Federal Taxation.

"Assignment of Income: Fruit and Tree as Irrigated by the P. G. Lake Case," 17 Tax Law Review 293 (1961–62) and Fourteen Tax Institute, University of Southern California (1962).
"Conveyances-Anticipation of Income," Breeding and Burton, Income Taxation of Oil & Gas Production §§ 6.01–6.05.
"Dual Retention of Royalty and Oil Payment upon Lease," Oil & Gas Tax Quarterly, January 1963. (A discussion of the trial court's decision in this case.)
"Recent Developments in the Field of Taxation Affecting Oil and Gas Transactions," 32 Tulane Law Review 607 (1958).
"Sales of Oil Payments," Fiske, Federal Taxation of Oil & Gas Transactions § 9.06.
"The Supreme Court and Taxation of Oil, Gas and Production Payments: The Lake Cases," 19 Louisiana Law Review 579 (1959).

17. Ibid.; Estate of O. W. Killam, supra; Jay H. Floyd, T. C. Memo. 1961–56, affirmed 309 F.2d 95 (5 Cir., 1962).

taxpayer carved out and sold one of the oil payments. Quoting from Lake, the Tax Court held that "the substance of what was received was the present value of income which the recipient would otherwise obtain in the future."

Subsequent to decision by the lower court of the present case, this Court affirmed the Tax Court decision in Floyd, supra, fn. 17.[18] The District Court, in a footnote, found a distinction between this case and Floyd because in that case there was an agreement by the assignor of the oil payment to repurchase portions thereof contingent upon production. This, the Court indicated, amounted to less than the complete divestiture required by the Commissioner to avoid ordinary income tax treatment. However, an examination of the assignment in Floyd reveals that the taxpayer sold the oil payment for $75,000 and agreed to repurchase a $7,500 portion for each well less than 21 drilled on the property by a certain date (there being 15 producing wells on the lease at the time of the sale). This agreement did not reduce the transaction to something less than a complete divestiture of ownership of the oil payment. In substance, the taxpayer guaranteed that if 21 wells were not drilled, then at the request of the assignee he would repurchase a certain number of oil payments. The option was vested in the assignee, not in the taxpayer.

In Floyd, just as here, the assignor retained a royalty and an oil payment, and subsequently sold the oil payment but retained the royalty. These interests were to run concurrently until the oil payment was completed. Nevertheless, this Court, in a *per curiam* opinion affirming the Tax Court, held the proceeds were taxable as ordinary income and stated that the principles involved were indistinguishable from Lake.[19]

In Floyd and Killam, just as in Lake, there was production from the property at the time of the assignment, and this production could be applied to pay-out the assigned oil payment. Lake clearly implies that reasonable foreseeability of pay-out is an element to be considered in determining whether a capital asset has been sold, or whether there has been merely an assignment of future income.[20]

■■■■■ Obviously, as argued by appellees, any rule deduced from these cases will not long survive possible ingenious or ingenuous devices for creating quasi-oil-payments and *sui generis* mineral interests in efforts to obtain capital gain tax results. For present purposes, nevertheless, the following precept, which we adopt and apply, seems correctly to identify proceeds from the sale of carved out oil payments which are not entitled

---

18. Floyd v. Commissioner of Internal Revenue, 5 Cir., 309 F.2d 95 (1962).

19. The Floyd case in effect overruled Witherspoon.

20. Lake, supra, 356 U.S. at page 262, 78 S.Ct. at page 693, 2 L.Ed.2d 743: "At the time of the assignment it could have been estimated with reasonable accuracy that the assigned oil payment right would pay out in three or more years. It did in fact pay out in a little over three years." At page 265 of 356 U.S., at page 694 of 78 S.Ct., 2 L.Ed. 743: "We do not see here any conversion of a capital investment. The lump sum consideration seems essentially a substitute for what would otherwise be received at a future time as ordinary income. *The pay-out of these particular assigned oil payment rights could be ascertained with considerable accuracy.*" (Emphasis added.) And in the same paragraph, on page 266, of 356 U.S., on page 695 of 78 S.Ct., 2 L.Ed.2d 743, the Court concluded that " * * * the substance of what was assigned was the right to receive future income. The substance of what was received was the present value of income which the recipient would otherwise obtain in the future. In short, consideration was paid for the right to receive future income, not for an increase in the value of the income-producing property."

See also Benjamin, Jr., and Currier, The Supreme Court and Taxation of Oil, Gas and Production Payments: The Lake Cases, 19 La.Law Rev. 579 (1959); Lyon and Eustice, Assignment of Income: Fruit and Tree as Irrigated by the P. G. Lake Case, 17 Tax Law Review 295 (1962).

to capital gain treatment: the assignment of an oil payment (not pledged for development), which extends over a period less than the life of the depletable property interest from which it is carved, results in ordinary income if the pay-out of the oil payment can be predicted with reasonable accuracy at the time of the sale.[21] Pay-out of an oil payment carved from producing property can be predicted with reasonable accuracy if it is not unreasonable to conclude that total reserves and the amount of production dedicated to pay-out are adequate for that purpose.[22] For undeveloped property, however, an additional determination is necessary, i. e., that adequate pay-out production reasonably can be expected from the property.

In applying our understanding of a proper application of the law to this case, two major questions arise: 1) was the oil payment carved out of a depletable property interest? and 2) could pay-out of the oil payment be predicted with reasonable accuracy at the time it was sold?

We believe the oil payment sold here was carved out of a depletable property interest. Considering the total effect of the transaction and not its mere form, it is reasonable to conclude that taxpayer (and his co-lessors) retained a 5⁄24 royalty interest and a $110,000 oil payment payable out of another 5⁄24 royalty. But, in finding that the assigned oil payment was carved out of taxpayer's depletable property interest, all the mineral interests which taxpayer retained underlying this one tract of land and subject to a single lease, under tax law principles, are to be considered as one interest.[23] Prior to execution of the lease, taxpayer and his co-lessors had full, perfect ownership of the land. By leasing it, they created another property interest for the benefit of the lessee, but the interest they retained continued as one interest. A landowner conceivably might purport to retain a thousand separate interests, although in reality what he has held back is but one reserved interest with various types of divisions or units. This analysis is implicit in Killam and Floyd.

21. Appellees, in their first supplemental briefs, suggest a similar rule, namely, that any interest which reasonably can be expected to terminate prior to the interest out of which it is created will not be considered as a *bona fide* property interest, the sale of which will be subject to capital gain treatment. However, the rule we adopt is not so broad as this. The fact that an oil payment is likely to be paid out prior to termination of the interest from which it is carved indicates probability that there has been a mere sale of anticipated income. Not so, with the rule appellees propose. There are many reasons besides pay-out which might cause an oil payment to terminate prior to the interest from which it was carved. As one example, an oil payment might be conditioned upon production from one particular well, which subsequently is found to be a dry hole, and other productive wells might be drilled on the lease, not subject to the oil payment. In Louisiana a purchaser assuming the risk of such a condition might be considered to have purchased a hope, and proceeds from such a sale might be subject to capital gain treatment. See fn. 6, supra.

22. If pay-out is not reasonably foreseeable, then the oil payment is treated as an interest extending over the entire life of the interest from which it is carved, and may be treated as a royalty interest. United States v. Morgan, 321 F.2d 781, (5 Cir., 1963).

23. The following definition of property "interest," which we believe is sound, is given at page 1154 of the New York University Twentieth Annual Institute on Federal Taxation: "The term 'interest' refers to the sum of the rights owned by the taxpayer in the property, and excludes the possibility that each individual right inherent in the ownership of the property may be a separate interest." Nevertheless, even if we were to conclude that there were two interests reserved, that would not necessarily cause the case to be decided in favor of taxpayer. He did not prove, nor offer any evidence to prove, that the oil payment sold was the one he reserved. From a reading of the assignment, it would be just as reasonable to find that the oil payment of $110,000 had been carved out of taxpayer's (and his co-lessors') royalty interest which extended throughout the life of the lease.

Here, looking at substance rather than form, we must find that pay-out of the oil payment could have been, and must have been, predicted with reasonable accuracy at the time it was sold. There was oil production on adjoining property; indeed, part of Dixie Plantation was included in a previously created production unit; the lessee, an experienced operator, thought there was a good possibility that the property would be productive of oil or gas; taxpayer and his co-owners were willing to accept a bonus of only $5,000 for a mineral lease on some 788 acres of obviously valuable property, or about $6.50 per acre, when it is well known that ordinarily the bonus for a lease similarly located would be at least $100, $200, $300 per acre, or more; the arrangement to sell the oil payment clearly had been completed before the lease was executed, as was conceded by appellee's counsel in oral argument; and the purchasers of the $110,000 oil pro-

duction payment paid $100,882.35 for it, a discount of less than 10 per cent.[24]

■ The analogy to a tree and its fruit has been widely adopted by legal writers in analyzing tax situations such as this.[25] If an assignor conveys, for a lump sum payment, a terminable interest which extends for a period less than the life of the property interest retained, this is referred to as a sale of the fruit. Such a sale results in depletable ordinary income. Where, however, the interest sold constitutes the entire interest of the assignor, or a fractional interest extending over the entire life of the lease, then this is a sale of the tree, or part of it. Such sales would be subject to capital gain treatment.

Here we hold that there was a sale of "fruit," not "tree," or a part of it.

We thus conclude that the proceeds received by taxpayer from the oil payment assignment in question fall within the

24. It has been suggested that assumption of a substantial risk by a purchaser of an oil payment is a major factor indicating there has been a sale of a capital asset. Benjamin, Jr., and Currier, "The Supreme Court and Taxation of Oil, Gas and Production Payments: The Lake Cases," 19 Louisiana Law Review 579, at 599 states: "The speculative factor may vary from one situation to another, but in any case where an oil payment is carved out of a property on which there is no well estimated to be capable of producing sufficient oil to satisfy the payment, the speculative factor is present, and roughly represented by the differential between the face value of the oil payment and the value of the consideration received for it by the assignor."

As noted above, the contract conveying the oil payment indicated it would terminate "if and when said lease to Chester Hunter shall terminate," but we do not believe that under this assignment the purchasers assumed the risk that no well would be drilled. The payment of $100,882.35 for the $110,000 oil payment strongly negates such a finding. If Hunter drilled two wells and produced no oil or gas, and the lease terminated, then the oil payment terminated. This was not the sale of a mere hope. See fn. 21, supra.

Although not the basis for this decision, for the reasons given above and

because there is strong evidence to support the proposition, there is good cause to believe that the transaction involved in this case actually was a bonus in disguise. If the $100,882.35 received by taxpayer and his co-lessors, plus the $5,000 so-called bonus, had been paid by Hunter as a bonus for the lease, and the lessors had retained only a 5/24 royalty, the net consideration received by the lessors would have been the same; but the $105,882.35 bonus clearly would have been taxable as ordinary income. A bonus must be treated by the lessor for tax purposes as an advance royalty payment, subject to depletion. Burnet v. Harmel, 287 U.S. 103, 53 S.Ct. 74, 77 L.Ed. 199 (1932).

Although the government in its brief and oral argument seemingly ignores the facts and admits the sale of the oil payment was to *un*related parties, it is interesting to note that the purchasers of the oil payment were Mrs. Bess W. *Schoellkopf* and Mrs. Kate E. *Bower*; and on March 27, 1958, among the owners of the lease were James R. *Bower*, Jr., J. Fred *Schoellkopf*, and Wilson *Schoellkopf*. This "coincidence," plus the other facts noted above, strongly indicate that the transaction was a bonus in disguise, and that it should be taxed as a bonus payment.

25. See fn. 16, supra.

rule subjecting them to tax treatment as ordinary income. We emphasize, however, that the tests we have made are merely tools used in analyzing the true nature of the transaction. Under the facts here present, we find that their application correctly establishes that taxpayer did not sell a capital asset, but merely assigned anticipated future income. The District Court's judgment is

Reversed.